UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. HEALTH DIMENSIONS REHABILITATION, INC., | Court File No. 07-3294 |
| | COMPLAINT AND DEMAND FOR A JURY TRIAL OF THE UNITED STATES OF AMERICA |
| Plaintiffs, | |
| v. | |
| REHABCARE GROUP, INC., REHABCARE GROUP EAST, INC., REHAB SYSTEMS OF MISSOURI, HEALTH SYSTEMS, INC., | |
| Defendants. | |

_____

The United States of America ("United States" or "the Government"), for its Complaint, states and alleges as follows:

**NATURE OF THE ACTION**

1.      The United States brings this action under the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), and the common law against Defendants RehabCare Group, Inc., RehabCare Group East, Inc., Rehab Systems of Missouri, LLC and Health Systems, Inc. (collectively "Defendants") for falsely submitting or causing to be submitted claims for payment to the United States.

2.      RehabCare Group, Inc. and RehabCare Group East, Inc. (collectively "RehabCare") are in the business of providing physical, occupational and speech therapy

to the residents of nursing homes pursuant to contracts with the homes. This type of business model is commonly referred to as a contract therapy company.

3.     Until early 2006, Rehab Systems of Missouri, LLC ("RSM") was also a contract therapy company.

4.     In early 2006, RehabCare and Rehab Systems of Missouri, LLC ("RSM") entered into a transaction, through which RehabCare paid RSM approximately $600,000 and also agreed to give RSM a lucrative 5-year contract guaranteeing RSM a portion of RehabCare's revenue from the stream of Medicare and Medicaid patient referrals of the nursing homes that RehabCare would service under the deal. Essentially, in exchange for directing the therapy business at the nursing homes to RehabCare, RSM received an up-front payment and was guaranteed over 10% of the revenue from the ongoing contract therapy operations.  Aside from continuing to deliver the business to RehabCare, RSM provided no services and no value in return.  This transaction (the "Transaction"), and the ensuing contract between RehabCare and RSM, constituted kickbacks paid from RehabCare to RSM in exchange for referrals of business reimbursed by Medicare and Medicaid.  It therefore violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the FCA.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because one or more defendants transacts business in this district, all defendants committed acts that violated 31 U.S.C. §§ 3729-3733, and the Relator is based in Minnesota.

7.      In particular, RehabCare has provided contract therapy in Minnesota for many years to dozens of facilities, including dozens of Skilled Nursing Facilities.  A list of such Minnesota facilities, previously provided by RehabCare, is attached to RehabCare's service copy of the Complaint.  The Government is prepared to provide the list to RSM and HSI as well, but RehabCare objects to that disclosure at this time. RehabCare's website indicates that RehabCare has contracts to provide therapy with approximately 50 Skilled Nursing Facilities in Minnesota.

http://www2.rehabcare.com/partner/where.html.

## PARTIES AND OTHER RELEVANT ENTITIES

8.      The United States brings this lawsuit on behalf of the Department of Health and Human Services ("HHS"), and on behalf of the other relevant government payors.

9.      Relator Health Dimensions Rehabilitation, Inc. ("HDR") is a Minnesota corporation with corporate headquarters located at 1994 E. Rum River Drive SE, Cambridge, Minnesota.   HDR provides physical, occupational and speech therapy services in nursing homes, outpatient clinics, schools, and in patient's homes, primarily in Minnesota. HDR's Chief Executive Officer, Mark Essling, is a resident of North Branch, Minnesota.

10.     RehabCare Group, Inc., incorporated in Delaware with its principal place of business in Kentucky, provides skilled rehabilitation services, including physical, occupational, and speech therapy, to patients at skilled nursing facilities ("SNFs") and assisted and independent living facilities around the country.   RehabCare Group, Inc. charges these facilities for therapy services and provides them with billing information that enables the facilities to submit claims to Medicare, Medicaid and other payors.

11.     RehabCare Group East, Inc. is a subsidiary of RehabCare Group, Inc. RehabCare Group East, Inc., organized under Delaware law with a principal place of business in Kentucky, is the formal corporate entity that entered into the contracts with RSM that prompted this lawsuit.

12.     RehabCare Group, Inc. and RehabCare Group East, Inc. were acquired on June 1, 2011 by Kindred Healthcare, Inc., a company incorporated in Delaware with its principal place of business in Kentucky. Kindred Healthcare, Inc. is a healthcare services company.  Following Kindred's acquisition of RehabCare, Kindred has referred to itself as the largest provider of rehabilitation therapy contract services in the United States, with nearly 2,000 rehabilitation therapy contracts.

13.     Rehab Systems of Missouri ("RSM"), a Missouri Limited Liability Corporation, offered contract rehabilitation services until 2006, exclusively or almost exclusively to nursing homes that were majority-owned by James Lincoln.   On information and belief, RSM is owned by Tom Hudspeth, James Lincoln, and Mr. Lincoln's son, Jimmy Lincoln.  Prior to the Transaction, Tom Hudspeth served in a capacity similar to a Chief Operating Officer for RSM.

4

14.     Health Systems, Inc. ("HSI"), a Missouri corporation, is a management company for various nursing homes. James Lincoln is the majority owner of HSI.

15.     James Lincoln is also the majority owner of approximately 60 independent nursing homes in Missouri that are all managed by HSI and that receive services pursuant to the Transaction (these nursing homes are referred to individually as "Nursing Home" and referred to collectively as the "Nursing Homes").

16.     Tom Hudspeth has had an active management role in HSI at all times relevant to this matter. He is a part owner of RSM, and served as the lead negotiator for the 2006 Transaction on behalf of RSM.

17.     Upon information and belief, RSM, HSI, and the Nursing Homes owned and operated by HSI do not have any formal corporate connection with one another, but do share common ownership.

## BACKGROUND

## THE LAW

**A.**     **The False Claims Act**

18.     The FCA provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or

approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

\* \* \*

is liable to the United States Government . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information

(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(a), (b) (FCA, pre-2009 amendments); 28 C.F.R. § 85.3.  *See also* 31 U.S.C. § 3729(a)(1)(A), (B), (b) (FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21).

## B.    The Anti-Kickback Statute

19.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), arose out of Congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.   To protect the integrity of the program from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.   First enacted in 1972, Congress strengthened the AKS in 1977 and 1987 to ensure that it kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972,

Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid

Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient

and Program Protection Act of 1987, Pub. L. No. 100-93.

20.     The AKS prohibits any person or entity from making or accepting

remuneration to induce or reward any person for referring, recommending or arranging

for federally-funded medical services, including services provided under the Medicare

and Medicaid programs.  The AKS provides, in pertinent part:

> (b) Illegal remuneration
>
> > (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
> >
> > > **(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > >
> > > **(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> *   *   *
>
> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

7

> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).   Violation of the statute can also subject the violator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).   The Department of Health and Human Services has promulgated safe harbor regulations that define practices that are not subject to the AKS because such practices would be unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952.

21.    In 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111–148 § 6402(f), 124 Stat. 119, 759 (to be codified at 42 U.S.C.§ 1320a–7b(g)).

C.    **Medicare and Medicaid**

22.    Medicare and Medicaid were created to provide access to healthcare for elderly, indigent or disabled residents of the United States.

23.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. 42 U.S.C. §§ 426-426a, 1395o.  Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care, to include care in skilled nursing facilities. Medicare Part B authorizes the payment of federal funds for medical and other health services that are not covered by Part A, including without limitation physician services, laboratory services, outpatient therapy, diagnostic services and radiology services.

24.    Medicare Part B also pays for certain services furnished to inpatients who either are not entitled to benefits under Part A or have exhausted their Part A benefit but are entitled to benefits under Part B of the program.

25.    The Secretary of HHS administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"). CMS contracts with private companies to process claims.

26.    Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. In order to be eligible for payment under the program, providers and suppliers must certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this [provider/supplier]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's/supplier's] compliance with all applicable conditions of participation in Medicare.

CMS Forms 855A, 8558. The Nursing Homes have been obligated to make and comply with this certification in order to be eligible to submit claims to Medicare.

27.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

## 1. **Medicare Payment System**

28.     For enrollees of Medicare and other federal insurance programs, Part A of the program provides coverage for up to 100 days for skilled therapy services provided to a beneficiary while an inpatient in a SNF. Part B of the program provides coverage for

skilled therapy to beneficiaries who have either exhausted their Part A benefit or are not otherwise entitled to Part A coverage.

29.     For Medicaid enrollees, skilled therapy is also a covered service.

30.     Facilities such as SNFs may elect to contract with third party suppliers of medical services, such as RehabCare, to provide care to their residents. These contracts are referred to as "under arrangement" contracts.

31.     When a SNF has entered into an "under arrangement" contract with a therapy services supplier, such as RehabCare, the supplier submits invoices to the SNF for the services it provides to residents, and the SNF, in turn, submits the claim for those services to Medicare, Medicaid, and other government payors. The therapy services supplier does not bill the payor directly.

32.     Pursuant to the SNF Consolidated Billing requirements that were implemented as a part of the Prospective Payment System ("PPS"), the SNF is responsible for including on its submission almost all of the services that a resident receives during the course of its stay, even services billed "under arrangement."

33.     For Part A beneficiaries, the SNF submits claims for therapy services as part of the Part A claims for the *per diem* assigned to that resident. As explained below, the Resource Utilization Group ("RUG") category for each Part A patient takes into account the facility's costs for services performed for Part A beneficiaries, including the skilled therapy services performed "under arrangement" with RehabCare.

34.     For Part B beneficiaries, who are not eligible under Part A or who have exhausted their Part A benefit, the SNF submits claims for payment for the therapy

services under the Medicare Fee Schedule ("MFS"). As explained further below, the MFS establishes a per-service payment for individual therapy services based on time-based codes appropriate to the service provided.

35.    Because therapy services are subject to Consolidated Billing requirements regardless of whether beneficiaries are in a covered Part A stay, SNFs (and not the third party supplier) submit claims to federal healthcare programs for all therapy services provided to residents under Part A, Part B, and other government programs.

36.    Claims for reimbursement for skilled therapy services provided in SNFs are submitted to Medicare on Claim Form 1450 (also called a UB-04), or its electronic equivalent. CMS makes payments on the claims for reimbursement retrospectively (after the services are rendered).

37.    At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility along with the patient activity. The SNF is required to accurately report its actual payments to suppliers, including the skilled therapy providers.

38.    The annual cost report is the final claim for payment and is submitted on CMS Form 2540-96 (unless the facility qualifies for a simplified cost report on Form 2540s). Annual cost reports constitute the final accounting of the facility's federal program reimbursement. The United States relies upon the annual cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare, Medicaid or other government programs.

39.     The SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations. The cost report requires the SNFs to certify that they have read a statement that states in pertinent part: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."   The SNF must further certify that:

> I have examined the accompanying electronically filed or manually
> submitted cost report and the balance sheet and statement of revenue
> and expenses … and that to the best of my knowledge and belief it is
> a true, correct, and complete statement prepared from the books and
> records of the provider in accordance with applicable instructions,
> except as noted. I further certify that I am familiar with the laws and
> regulations regarding the provision of health care services, and that
> the services identified in this cost report were provided in compliance
> with such laws and regulations.

40.     The Home Office of a chain of Nursing Homes also submits an annual cost report.   The Home Office Cost Report similarly requires an Officer from the Home Office to certify that they he has read a statement that states in pertinent part: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."

41.     CMS uses the data submitted on the cost reports to support management of the federal programs, including to develop the cost limits and rates applicable to providers and suppliers.

2. **Part A Reimbursement to Skilled Nursing Facilities**

42.     For cost report periods after July 1, 1998, reimbursement to SNFs for Medicare Part A is made under the PPS.

43.     Medicare's PPS reimburses facilities for the operating costs of inpatient healthcare services rendered to Medicare beneficiaries according to a per-patient standardized rate, called a *per diem*.

44.     The *per diem* is designed to account for the costs of each enrollee's stay in a SNF, including the cost of skilled therapy services.

45.     The *per diem* for each beneficiary depends on the severity of the beneficiary's condition, classified according to a Resource Utilization Group, or "RUG." Each RUG category groups beneficiaries who have similar conditions and/or limitations, who will therefore require similar care, and are therefore reimbursed according to a similar rate. The current version of RUG classifications is known as RUG III.

46.      Generally, the PPS *per diem* for each RUG III is established based on Medicare payments for allowable SNF costs under Part A and Part B during applicable cost reporting periods beginning in fiscal year 1995.  This payment is then adjusted by market-based index amounts (accounting for cost increases between cost reporting periods) and case-mix and area-wage level index amounts to arrive at the final *per diem* payment. 42 C.F.R. §§ 413.330, 413.337.

## SPECIFIC ALLEGATIONS

### A. Background: Contract Therapy and Relationship Between RSM, HSI and the Nursing Homes

47.     Each of the Nursing Homes owned by James Lincoln is organized as a separate corporate entity.  Each of them contracted with HSI to provide "management consulting and advisory services."  In exchange for those management services, HSI received a percentage of the Nursing Home's revenue as a "management fee."

48.     Nearly all of the Nursing Homes contracted with RSM to provide therapy services, including physical therapy and occupational therapy.

### B. 2003 Discussions Between The Parties

49.     In 2003, RehabCare was interested in acquiring a therapy company that was owned and operated by a nursing home owner/operator.

50.     In July 2003, Donald Adam, a high-level RehabCare finance executive, prepared a memo to RehabCare's then-CEO, John Short, analyzing the potential in house contract therapy companies that might fit that criteria and make attractive acquisition targets. RehabCare planned to make any such purchase contingent on a corresponding long-term therapy contract with the nursing homes. RehabCare found this type of purchase to be particularly attractive because it provided the ability to acquire a long term revenue stream of referrals from the nursing homes.

51.     Mr. Adam provided Mr. Short and other RehabCare finance executives involved with acquisitions, including Pat Henry and Mark Bogovich, with a list of

companies that matched RehabCare's acquisition criteria. RSM was the first company on the list.

52.     Around July 2003, RehabCare approached RSM to discuss a potential acquisition.

53.     At the time, RehabCare already provided contract therapy services in two Nursing Homes managed by HSI.

54.     In September 2003, RehabCare prepared an internal document, titled in part "62 Contracts—Asset Purchase," in which RehabCare summarized the status of its discussions with RSM. Upon information and belief, the 62 Contracts alluded to the number of the Nursing Homes that contracted with RSM.

55.     In that internal document, RehabCare referred to RSM as the "captive rehab arm" of HSI, a SNF operator.

56.     RehabCare stated in the internal document that RSM was motivated to sell so that its owners could make money from their investment in RSM and generate capital to further grow HSI.

57.     The September 2003 internal document contemplated a purchase price of $7 million.

58.     The contracts then in place between each of the Nursing Homes and RSM permitted either side to terminate the agreement for any reason with 30 days notice to the other side.

59.     RehabCare proposed purchasing RSM for $7 million. That price was contingent on RehabCare entering into a 5-year contract with each of the 62 nursing

homes managed by HSI.  In other words, RehabCare would pay $7 million, and would, in return, receive a five-year stream of referrals from the 62 Nursing Homes managed by HSI that would agree to purchase therapy services from RehabCare.

60.     Don Adam, Pat Henry and Mark Bogovich were all involved in negotiating the transaction on behalf of RehabCare.  Tom Hudspeth was primarily responsible for negotiations with RSM, and Dan O'Brien was also involved.

61.     On September 9, 2003 and September 10, 2003, Adam, Hudspeth, Bogovich and O'Brien exchanged emails that expressed concerns that the deal as proposed would violate the AKS. Mr. Adam expressed a desire to close the deal, but not at the risk of a possible lengthy prison sentence.

62.     Upon information and belief, those AKS concerns related to the fact that RehabCare was not willing to acquire the company with the contracts as written in place because they only provided a guaranteed revenue stream for 30 days; however, lengthening the contracts to provide RehabCare with a guaranteed revenue stream would violate the AKS.

63.     RehabCare did not purchase RSM in 2003.

### C. 2004 Amendments to the Nursing Home Contracts

64.     In 2004, at least some, and on information and belief all, of the Nursing Homes entered into new contracts with RSM.  The Nursing Homes were no longer able to terminate their contracts for any reason with 30 days notice.  Instead, each Nursing Home was locked into a five year contract, with only one potential one-time exception

that was unlikely to be relevant.  Upon information and belief, the Nursing Homes agreed to pay across the board price increases of slightly more than 10% for the provision of Part A therapy services.

65.     Upon information and belief, these contractual changes were made in part to facilitate a deal with RehabCare.  The parties were concerned in 2003 that giving RehabCare a 5-year contract with the Nursing Homes as a condition of an acquisition would violate the AKS, so James Lincoln changed the contracts between RSM and the Nursing Homes so that RSM had a guaranteed five year referral stream with each of the Nursing Homes.  If RehabCare had purchased RSM in 2003, it would have acquired contractual rights that any of the Nursing Homes could terminate with 30 days notice.  Mr. Lincoln removed that issue in 2004, giving RSM a large contractually guaranteed revenue stream through 2009.

### D. <u>2005 Negotiations Lead to 2006 Transaction</u>

66.     In 2005, RSM (the contract therapy company owned by James Lincoln, Jimmy Lincoln and Tom Hudspeth), HSI (the management company owned by James Lincoln) and RehabCare rekindled their discussions.

67.     At the time, a potential transaction was very attractive to RehabCare.  RehabCare was anxious to establish contract therapy arrangements with a large number of nursing homes in Missouri, and the most efficient way to do so was to contract with a chain of nursing homes.  RehabCare continued to be intrigued by RSM's status as an "in house" therapy company, and the attendant guaranteed long term revenue streams.

68.     In September 2005, RehabCare made a new proposal to HSI. RehabCare indicated that in RehabCare's experience, facilities that contracted with RehabCare saw a sizable shift in their average daily census, RUG distribution and profit (the higher the daily census, the higher the number of beneficiaries that can have services billed to Medicare and Medicaid).  The suggestion was straightforward: facilities that contracted with RehabCare could expect that RehabCare would provide more therapy to the facilities' beneficiaries, and as a result, the facilities would make more money.  The proposal indicated that the percentage of patients in the highest—and most profitable—RUGS categories doubled when RehabCare entered the picture, and that facilities' profits nearly doubled as well.

69.     RehabCare also projected that with RehabCare in the picture, the facilities' annual Part B days would increase by 50%.  For Part A therapy, RehabCare projected that the new RUGS distribution would mimic the results that RehabCare had achieved in other facilities and that annual Part A days would increase by 15%.  These changes would greatly improve HSI and RSM's bottom line.

70.     After considering the proposal, Tom Hudspeth, a key executive with RSM and HSI, told RehabCare that the proposed price was not attractive enough to consummate a deal.

### 1.     Tom Hudspeth, on behalf of RSM and HSI, insisted that RehabCare pay $600,000 to close the deal.

71.     In November 2005, Tom Hudspeth spoke with RehabCare's Pat Henry. Hudspeth told Henry that "money always talks." He asked RehabCare to make a proposal

at a lower rate.  Hudspeth also informed Henry of a $600,000 "problem" with a self funded health insurance plan and indicated that RehabCare needed to take that into account in any deal.  Hudspeth told RehabCare that any future conversations about the potential deal should be only with him.

72.     RehabCare executives recognized in internal emails in November and December 2005 that the $600,000 health insurance problem seemed to be RSM's "biggest issue."

73.     RehabCare recognized that the ultimate transaction would need to account for that $600,000 issue.

74.     RehabCare also ultimately agreed to RSM's terms on price.  The Nursing Homes were paying RSM the equivalent of $1.05/minute for the Part A services at the time of the negotiations, and RehabCare agreed to provide the care directly to the Nursing Homes for $.89/minute.  The Nursing Homes were paying RSM 80% of the fee schedule for Part B services, and RehabCare agreed to provide the care directly to the Nursing Homes for 70% of the fee schedule.

### 2.     Tom Hudspeth Insisted That RSM Be Included In The Deal.

75.     RehabCare drafted a contract that offered the $.89/70% terms directly to the Nursing Homes, and sent it to RSM/HSI for review.

76.     In response to RehabCare's proposal to make a deal directly with the Nursing Homes, Hudspeth made clear that RSM was the entity that should reap the benefits of the deal. He took issue with the fact that "[a]s the Agreement stands all savings would go to the individual facilities and not to the owners of Rehab Systems."

77.     There was no valid business reason for RSM to be included in the deal. RSM provided nothing legitimate of value to the proposed Transaction. Yet Hudspeth, who had asked that communications about the deal be only with him, insisted that RSM be included in the Transaction.

78.     Including RSM in the Transaction created a financial windfall to Hudspeth, who had a financial stake in RSM but no financial stake in HSI or the Nursing Homes. RehabCare was aware that Hudspeth had a financial stake in RSM.

79.     RehabCare agreed to structure the deal as Hudspeth requested.  In the final Transaction, RehabCare replaced RSM as the actual therapy provider to the Nursing Homes.  RSM maintained its contracts with the Nursing Homes and continued to receive $1.05 per minute for Part A services and 80% of the fee schedule for Part B services. RSM passed along only a portion of those fees—$.89 per minute for the Part A services and 70% of the fee schedule for the Part B services—to RehabCare, and RSM retained the rest of the money for itself.

80.     For most of the time since the deal closed, RSM has conducted no operations.  But it has continued to collect a significant percentage of the revenue from the deal.  In essence, the deal created a joint venture between RSM and RehabCare, with the revenue for the therapy split in the ratios described above and all of the work in the venture performed by RehabCare.

81.     RehabCare also agreed to pay approximately $600,000 to RSM when the Transaction was finalized.  The Transaction went into effect in February 2006.

**3.**   **The Companies' Contemporaneous Actions Indicate That They Realized That the Transaction Violated the Law.**

82.   The companies took steps to conceal the nature of the Transaction. RehabCare made reference to a $.6 million payment associated with the deal on an earnings call on or about May 4, 2006.   It also referenced the $.6 million payment in other public documents.   RehabCare's public comments made no reference to the fact that RSM had requested $600,000 to deal with a health insurance issue.   RehabCare stated instead that the payment was made for a "recruiting fee."

83.   When RehabCare was asked a follow-up question about the Transaction on that same earnings call, an analyst listening to the call indicated, "then it's kind of like an acquisition, what you did?   RehabCare's representative responded, "we would prefer for legal reasons not to characterize it that way." This comment indicates RehabCare's knowledge that the transaction was legally problematic.

84.   The parties took steps to conceal the true nature of the Transaction from their own employees.   The Subcontract Agreement memorializing the Transaction does not indicate that RSM would continue to receive a portion of the profits from the ongoing therapy. Employees on both sides believed that RSM had simply ceased to exist after the Transaction closed.

85.   On various cost reports filed by HSI and the Nursing Homes to Medicare during the relevant time period (for example, Sweet Springs Villa's cost reports in 2008 and 2009), James Lincoln is identified as the 100% owner of RSM.   According to representations made by James Lincoln and others in the context of this case, those

representations are incorrect because Tom Hudspeth and Jimmy Lincoln own a combined 25% of the company. This omission conceals Hudspeth's interest in the profits of the Transaction going to RSM.

86.     A number of documents put Defendants on notice that their proposed arrangement would violate the law. Many public documents set forth the prohibition on kickbacks and the contours of that prohibition, as well as the prohibition on a deal taking into account the value of referrals from federal health care payors.  Others such as the Health and Human Services Office of Inspector General's Special Advisory Bulletin titled "Contractual Joint Ventures," *see* 68 Fed. Reg. 23148 (April 30, 2003) set forth the prohibition on circumventing the AKS by entering into a *de facto* joint venture.

### E. The Impact of the Transaction

#### 1. RSM's Owners Have Been Very Well-Compensated for the Transaction Despite Contributing Nothing.

87.     For most of the time period since the Transaction closed, RSM has not had a single full-time employee.  It conducts no operations. But RSM's profit since the Transaction closed exceeds $10 million. That profit is risk-free; RSM has few actual expenses, no employees, and provides nothing of value to the Nursing Homes and no legitimate services to RehabCare.

88.     There is not presently, nor has there ever been since the Transaction closed, any valid business reason for RehabCare to pay a significant amount of money to RSM for its continuing role in the provision of therapy to the Nursing Homes.

89.     On information and belief, all of RSM's revenue is derived from a share of the revenues arising from therapy provided by RehabCare to the Nursing Homes, and more than 90% of that revenue is from federal health care payors.

90.     The Transaction does not fit into any statutory exception or safe harbor to the AKS. In particular, because RSM received an amount in excess of fair market value in arms-length transactions and an amount that explicitly took into account the volume or value of referrals for Medicare and Medicaid, the Transaction does not meet the criteria set forth in the "Personal Services and management contracts" exception at 42 C.F.R. § 1001.952 (d).

### 2. Therapy Utilization, and Corresponding Federal Payments, Have Increased Considerably Since the Transaction Closed.

91.     As RehabCare predicted, Medicare patient therapy revenue and utilization spiked after the deal closed and patient referrals to RehabCare began.

92.     Following the close of the Transaction, the Nursing Homes requested and received substantially more money from Medicare and Medicaid after the Transaction closed than they had prior to RehabCare's involvement.  RehabCare achieved a shift in RUG numbers, therapy minutes, Average Daily Census and other values in keeping with its predictions.

93.     The Nursing Homes' Medicare income more than doubled between 2005, the year before the transaction closed, and 2008, and it continued to increase from there.

94.     RehabCare has received in excess of $70 million in revenue from the Transaction since it closed in 2006.

F. **False Claims**

95.     As a result of their fraudulent course of conduct, Defendants knowingly caused the submission of false or fraudulent claims to the Medicare and Medicaid programs. Because the contract between RSM and RehabCare was tainted by a kickback, all claims submitted pursuant to that contract were materially false for purposes of the FCA.

96.     The Nursing Homes and the HSI Home Office each submitted annual cost reports from 2006-present in keeping with the procedures set forth above.

97.     By way of example, listed below are 20 example false claims to Medicare for various facilities. These represent false claims that were presented to, and paid by, Medicare as a result of the Transaction.

| Facility | Pt. | DOS From         To | Proc. Code | Amount Paid | RUG code |
|---|---|---|---|---|---|
| SweetSprings Villa | A | 09/01/2010 – 09/14/2010 | RHA07 | $ 3,678.61 | RH |
| SweetSprings Villa | B | 07/13/2009 – 07/31/2009 | RHA01 | $ 4,466.32 | RH |
| SweetSprings Villa | C | 02/01/2008 – 02/08/2008 | RUB07 | $2,275.88 | RU |
| SweetSprings Villa | D | 11/01/2007 – 11/30/2007 | RVB03 | $ 4,951.32 | RV |
| Current River | E | 12/07/2010 – 12/31/2010 | RHC10 | $10,248.42 | RH |
| Current River | F | 08/01/2009 – 08/31/2009 | RVL11 | $ 8,486.55 | RV |
| Current River | G | 03/01/2008 – 03/31/2008 | RVA03 | $ 5,850.94 | RV |
| Current River | H | 07/08/2007 – 07/31/2007 | RUC07 | $ 8,122.36 | RU |
| Grand River | I | 02/01/2010 – 02/28/2010 | RHA01 | $ 7,374.90 | RH |
| Grand River | J | 01/03/2009 – 01/31/2009 | RHA07 | $ 6,177.62 | RH |
| Grand River | K | 11/01/2008 – 11/30/2008 | RHA03 | $ 4,898.40 | RH |
| Grand River | L | 11/01/2007 – 11/05/2007 | RHB02 | $    881.55 | RH |
| Gerald Nsg. & Rehab | M | 07/08/2010 – 07/31/2010 | RVB07 | $ 8,626.28 | RV |

| | | | | | |
|---|---|---|---|---|---|
| Gerald Nsg. & Rehab | N | 05/18/2009 – 05/31/2009 | RUC01 | $ 6,890.24 | RU |
| Gerald Nsg. & Rehab | O | 07/17/2008 – 07/31/2008 | RVB11 | $ 3,534.15 | RV |
| Gerald Nsg. & Rehab | P | 11/01/2007 – 11/30/2007 | RVC07 | $ 8,985.10 | RV |
| Lincoln County | Q | 02/01/2010 – 02/28/2010 | RUB01 | $ 9,010.66 | RU |
| Lincoln County | R | 07/01/2009 – 08/01/2009 | RUB17 | $11,083.00 | RU |
| Lincoln County | S | 02/01/2008 – 02/27/2008 | RUA02 | $ 8,571.21 | RU |
| Lincoln County | T | 07/08/2007 – 07/29/2007 | RVA07 | $6,473.57 | RV |

98.     By way of further example, a disc containing a spreadsheet of therapy claims provided between 2006 and 2010 at five of the Nursing Homes will be served on Defendants contemporaneously with the filing of this Complaint.  For each claim, the claims data provides information under the following headings:

> Provider_Number, Claim_Number Beneficiary_ID bene_full_name,
> Claim_DOS_From, Claim_DOS_Thru, Revenue_Center_Date
> Revenue_Center_Code, fac_revenue Procedure_Code, Principal_Diagnosis,
> dx, amt_chrg_clm, Amount_Paid_Claim, Date_Paid, Units_Billed, ARD,
> RUG, ADL,   MDS, LOS, ICD9_Cod, Type_of_Bill, Admission_Date,
> Beneficiary_Discharge_Date, Discharge_Status, fac_dschg_stat,
> Qualifying_Stay_DOS_From,  Qualifying_Stay_DOS_Thru,
> Revenue_Center_Rate Attending_UPIN, Att_Physician_Last_Name,
> Beneficiary_DOB, AC_Number, ac_num_label, bene_ssn,
> Admitting_Diagnosis_Code, and dx

This list includes: a) The Provider Number for the relevant Nursing Home, b) the beneficiary's name, c) the dates of service relevant to the claim, d) the relevant RUG information, and e) the amount paid for the claim and the date the claim was paid.  The

claims data has not been filed in the public record in order to protect confidential patient information contained therein.

99.     RSM also possesses financial statements for all full years from 2005-the present that indicate RSM's total annual Medicare Part A income, total annual Medicare Part B income, and total annual Medicaid income.  The financial statements also indicate the income that each of the Nursing Homes received each month for Medicare Part A, Medicare Part B, and Medicaid.  Because RSM conducted no operations other than receiving income pursuant to its arrangement with RehabCare, these amounts should all be the result of claims submitted to federal payors, and paid, in connection with the Transaction at issue in this case.  The United States is in possession of the financial statements from 2005-2009, and will provide them to RSM and HSI with a service copy of the Complaint.  The Government is prepared to provide them to RehabCare Group as well, but RSM has designated the documents as confidential and objects to that disclosure at this time.

## COUNT 1

## VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)

100.   The United States incorporates by reference the allegations set forth in paragraphs 1 through 99 as though fully set forth herein.

101.   The various Nursing Homes, and Health Systems, Inc., agreed in their Provider Agreements and in their annual cost reports that they would comply with the Anti-Kickback Statute.

102.    By the acts described above, from approximately March 2006 to the present, Defendants knowingly presented, or caused to be presented, to an officer, employee, agent or contractor of the United States, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1) (pre-2009 amendments) and 31 U.S.C. § 3729(a)(1)(A) (current version of False Claims Act).

103.    By the acts described above, from approximately March 2006 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, or material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(2) (pre-2009 amendments) and 31 U.S.C. § 3729(a)(1)(B) (current version of False Claims Act).

104.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty in the amount of eleven thousand dollars ($11,000.00) for each violation.

## SECOND CAUSE OF ACTION

### (UNJUST ENRICHMENT)

#### Against All Defendants

105.    The United States incorporates by reference the allegations set forth in paragraphs 1through 99 as though fully set forth herein.

106.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

107.    From approximately March 2006 to the present, by directly or indirectly obtaining Government funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## THIRD CAUSE OF ACTION

### (PAYMENT BY MISTAKE)

### Against All Defendants

108.    The United States incorporates by reference the allegations set forth in paragraphs 1 through 99 as though fully set forth herein.

109.    This is a claim for the recovery of monies paid by the United States to Defendants as a result of mistaken understandings of fact.

110.    The false claims that Defendants submitted or caused to be submitted to the United States' agents were paid based upon mistaken or erroneous understanding of material fact.

111.    The United States would not have paid those claims had it known the true facts.

112.    From approximately March 2006 to the present, the United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in certain health care claims, paid Defendants certain sums of money to which they were not entitled, and Defendants are thus liable to account and pay such amounts to the United States.

## PRAYER FOR RELIEF

113.   WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

a)       On the First Cause of Action under the False Claims Act, against all defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, and civil penalties in the amount of eleven thousand dollars ($11,000.00) for each false claim submitted or paid, together with such further relief as may be just and proper.

b)       On the Second, Third and Fourth Causes of Action, against all defendants jointly and severally, for unjust enrichment, payment by mistake, and common law recoupment for the damages sustained and/or amounts by which defendants were unjustly enriched or by which defendants retained illegally obtained monies, together with such further relief as may be just and proper.

c)       On all Counts, for prejudgment and postjudgment interest, the costs of this action, and such other and further relief to which the United States may be entitled.

Dated: December 5, 2011                     Respectfully submitted,
                                            B. TODD JONES
                                            United States Attorney


                                            s/ Chad A. Blumenfield

                                            BY:  CHAD A. BLUMENFIELD
                                            Attorney ID Number 387296
                                            Assistant United States Attorney
                                            600 U.S. Courthouse
                                            300 S. Fourth Street
                                            Minneapolis, MN 55415
                                            (612) 664-5600 Telephone
                                            chad.blumenfield@usdoj.gov


                                            Joyce R. Branda
                                            Tracy L. Hilmer
                                            Susan C. Lynch
                                            Attorneys, Civil Division
                                            U.S. Department of Justice
                                            Civil Division – Fraud Section
                                            601 D Street, N.W., Room 9012
                                            Washington, D.C.  20004